FRUGÉ, Judge.
Plaintiff, New Iberia National Bank, filed this suit against Teeter Mobile Home Sales, Inc., its two principal stockholders, Winston Teeter and Anthony Ackal, individually, and against Earl H. Willis, individually. The suit is against the corporation as the maker of and the individuals as the endorsers of a promissory note dated May 18, 1971, in the amount of $31,176.-00. • The plaintiff bank filed a motion for summary judgment as to the defendant, Anthony Ackal, which was granted. After trial on the merits, the trial court rendered judgment in favor of the plaintiff and against Teeter Mobile Home Sales, Inc. and Winston Teeter. The trial court exonerated Earl H. Willis from liability on the grounds that his endorsement was conditioned on the bank having a valid pledge of eight mobile homes and the bank did not have such a pledge and that, regardless of the validity of the pledge, the bank was grossly negligent in its care of the pledged mobile homes and that this negligence released Willis from liability on the note. We agree with the decision of the trial court that Willis’ endorsement was conditioned on the bank having a valid pledge and that the bank did not have such a pledge; therefore, we affirm.
Some time prior to May 19, ■ 1971, Winston Teeter, the president of Teeter Mobile Home Sales, Inc., and Anthony Ackal, the vice president of Teeter Mobile Home Sales, Inc., approached Mr. J. Ferdie Hebert, the executive vice president of the New Iberia National Bank, to inquire as to the possibility of borrowing funds. These funds were to be secured with the pledge of eight mobile homes and the endorsements of Mr. Teeter and Mr. Ackal. The two men were informed that the bank had already loaned the corporation in excess of $120,000 and that additional security would be required. It was agreed that the endorsement of Mr. Willis would be sufficient additional security. The two men approached Mr. Willis and requested that he endorse the note for them. In the past, Mr. Willis, an attorney at law, had been requested from time to time to perform legal services for the corporation.
When Mr. Willis went to the bank to discuss the proposed transactions with Mr. Hebert he was assured by Mr. Hebert that there would be a valid pledge of the mobile homes. Teeter and Ackal assured Mr. Willis that the mobile homes were new, that they were unencumbered, and that they would be pledged to the bank as security for the loan. It was further agreed between the parties that none of the eight mobile homes would be sold without securing the permission of Mr. Willis. All monies received from the sale of the homes would be applied to the payment of the promissory note. The back of the note contained the following notation:
"Secured by pledge of mobile homes as follows:
1970 Diplomat #FK2 — 1250—1717C
1969 Ramada #2 — 1248—E—2699
1970 Artcraft #6412 — 7324A
1969 Ramada #2 — 1248—E—2696
60' Monterey #60 — 12—L1323Z
60' Monterey #60 — 12—L1342Z •
60' Custom #10 — 12—L1638
65' Monterey #65 — 14—L1402Z" . (Tr. 59)
Subsequently one of the homes was sold. Willis was contacted as to the amount to be received for the home, agreed with the sale, and the proceeds of the sale were applied toward the liquidation of the note. Following the signing of the note the bank appointed Ackal as custodian of all of the mobile homes.
*637 In September, or earlier, a judgment was obtained by one I. A. McCann against Teeter Mobile Home Sales, Inc., in the Ninth Judicial District Court for the Parish of Rapides. The claim was for unpaid rent. The proces verbal indicates that three of the above mentioned mobile homes were sold at the sheriff’s sale. Prior to the sale on November 7, Ackal, Teeter, and Hebert met, at which time Hebert was advised of the impending sale under foreclosure on the judgment obtained on the landlord’s lien. Willis was also advised prior to the sale of the impending foreclosure. Hebert and Ackal went to Alexandria in advance of the sale to look into the matter, but the record is unclear as to any steps which they took with respect to the sale. The three mobile homes were sold for $8,000 in excess of the judgment for unpaid rent, but this $8,000 was seized by the State of Louisiana in connection with a $370,000 tax lien against Teeter Mobile Home Sales, Inc.
In this suit the bank’s action against Willis was based on his endorsement of the note. Willis defended on the ground that the endorsement was conditioned upon a valid pledge of the eight mobile homes and that such a pledge did not in fact exist. The issues before this court are (1) whether the endorsement was conditioned and (2) whether the condition was met.
We agree with the trial court that “the evidence shows, without contradiction, that the bank, through Hebert, did assure defendant, Willis, that it did in fact have a pledge of the eight mobile homes involved herein. This is abundantly' shown by the testimony of Hebert, Willis and Teeter, and nowhere is it contradicted.” (Tr. 92). Furthermore, the notation on the reverse side of the note, mentioned above, indicated that the note was secured by a pledge of the eight mobile homes. This evidence on the note itself tends to corroborate the testimony of Hebert, Willis and Teeter that the endorsement of Willis was conditioned upon the bank holding a valid pledge of the eight mobile homes. Therefore, we find that the endorsement was conditioned upon the bank holding a valid pledge of the mobile homes, and it must next be determined whether this condition was met.
The evidence and testimony presented indicate, as the trial judge stated in his written reasons for judgment, that the pledgee and the custodian never at any time knew where the pledged property was until several months subsequent to the defendant’s endorsement. The uncontradicted testimony of Mr. Jack Broussard, the successor to Mr. Hebert as executive vice president of the New Iberia National Bank is as follows:
“Q. So to your knowledge, nobody from the bank saw any of these mobile homes except the three that you personally saw in Alexandria.
A. That’s right.
Q. At no time, if I understand your testimony, did the bank have any knowledge where these mobile homes were?
A. Not definitely, no.” (Tr. 227-228) He further stated the following:
“Q. Now, as custodian of the bank when he [Mr. Ackal] was appointed in accordance with the custodian agreement, he was supposed to hold that property for the bank. Did he at any time specifically tell you where all eight of these mobile homes were when you requested it?
A. No, I don’t think he ’had custody of them, and I don’t think he had control of them.
Q. Well, this is what I want to try to get straight. If he did not, who ■ had control of .it in view of these custodian agreements ?
A. I think Mr. Teeter as president of the corporation had the say-so on what was going to be moved or *638 where or when or everything else.” (Tr. 233-234)
The trial judge had the following to say after quoting the above portions of the testimony :
“At the time of the alleged pledge, the pledgee and plaintiff in this suit had not the slightest idea as to the location of the eight trailers pledged. Supposedly they were on some of the lots of the Teeter Mobile Home Sales Company, on any one of sixteen different sales lots in any one of three different states, Mississippi, Texas and Louisiana. At the time of the alleged pledge, the custodian appointed by the bank, Anthony H. Ackal, all of the evidence shows, had no idea where any of the pledged trailers were located. Even Winston Teeter did not know where these particular pledged mobile homes were located. He assumed or thought they were in Louisiana, however, the one which was sold, and the proceeds credited to this obligation, was located in Texas.” (Tr. 96)
We agree with the trial court that the above quoted portions of the testimony indicate that the bank and its custodian, Ackal, did not know the location of the pledged mobile homes. Without knowledge of the location of the mobile homes it was impossible for the bank or its custodian to have possession of the pledged mobile homes.
Article 3152 of the Revised Civil Code of Louisiana states the following requirements with regard to the pledge:
“It is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right.”
This article was discussed and applied in D’Amico v. Canizaro, 256 La. 801, 239 So. 2d 339 (1970), and has been discussed and applied in countless cases in the past. See for example Steadman v. Action Finance Corporation, 197 So.2d 424 (La.App. 2nd Cir. 1967); Montaldo Insurance Agency, Inc. v. Culotta, 153 So.2d 899 (La.App. 4th Cir. 1963) ; T. A. Gaskin Lumber Co. v. Airline Lumber Co., 127 F.Supp. 461 (E.D.La.1953).
Since it is essential to a valid pledge that the pledgee or its custodian have possession of the pledged thing and since the evidence in this case indicates that neither the bank nor its custodian had possession of the mobile homes, we find that in the present case there was no valid pledged. Therefore, the condition upon which Willis based his endorsement was not met, and he cannot be held liable on his endorsement.
For the reasons assigned, we affirm the judgment of the District Court. The plaintiff-appellant is assessed with all costs of this appeal.
Affirmed.
WATSON, J., dissents and assigns written reasons.